## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE JASON DICKS<br>*Debtor* | CASE NO. 25-11336<br>JUDGE JESSICA E. PRICE SMITH<br>CHAPTER 11<br>SUBCHAPTER V |
| JASON DICKS, DEBTOR-IN-POSSESSION<br>*Plaintiff*<br>*V.*<br>JOSEPH T. CIRESI<br>*And*<br>CASSIE CIRESI<br>*Defendants* | ADVERSARY NO.<br><br>ALL DOCUMENTS REGARDING THIS MATTER MUST BE IDENTIFIED BY **BOTH** ADVERSARY AND BANKRUPTCY CASE NUMBERS AND NAME OF JUDGE |

### COMPLAINT TO DETERMINE THE EXTENT, PRIORITY AND VALIDITY OF LIENS

Jason J. Dicks, Debtor in Possession ("Dicks" or "Plaintiff") respectfully sets forth the following for his Complaint:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this case under and pursuant to 28 U.S.C. §§157 and 1334 and General Order 2012-7 of the United States District Court for the Northern District of Ohio. Venue is proper in this Court under and pursuant to 28 U.S.C. §§1408 and 1409.

2. This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A), (K), and (O).

3. Plaintiff consents to entry of final orders and/or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. In addition, pursuant to Bankruptcy Rule 9015(b), Plaintiff consents to a jury trial by a Bankruptcy Judge under 28 U.S.C. §157(e).

## PARTIES

4.  Plaintiff is the Debtor in Possession in Bankruptcy Case No. 25-11336-jps in which this adversary proceeding is filed (the "Bankruptcy Case").

5.  Defendant Joseph T. Ciresi is an individual residing in the State of Ohio or in the State of Florida who may be served with the complaint and summons via regular US Mail postage prepaid addressed to 2867 Fowler Dr., Willoughby Hills OH 44094, and/or to Joseph T Ciresi, 400 Flagship Drive Suite #303, Naples FL 34108.

6.  Defendant Cassie Ciresi is an individual residing in the State of Ohio who may be served with the complaint and summons via regular US Mail postage prepaid addressed to 5640 SOM Center Rd., Solon OH 44139.

## FACTS COMMON TO ALL COUNTS

7.  On February 23, 2023, Plaintiff entered into a "Membership Interest Purchase Agreement" with Joseph T. Ciresi for the purchase of "100% of the Membership Interest" of Pizzeria Management III LLC (the "Membership Interests"). A copy of the Membership Interest Purchase Agreement is attached hereto as Exhibit A (the "Purchase Agreement").

8.  The Purchase Agreement provides, in Paragraph 2, that Plaintiff would pay the sum of $575,000 to Joseph Ciresi, as seller, for the Membership Interests, and further provides that the Purchase Price would be paid as follows: (i) a $100,000 payment at closing; (ii) a cognovit note in the amount of $150,000 secured by a mortgage by Mr. Dicks' personal residence in the amount of $150,000 ("Ciresi Mortgage"); and (iii) a promissory note for $325,000, which was to "incorporate" a Membership Interest Pledge Agreement.

9.  The Purchase Agreement includes as Exhibit B, a copy of a promissory note in the original principal amount of $325,000 dated February 23, 2023, signed by Mr. Dicks

individually and as a Member of Pizzeria Management III LLC, both of whom are identified as "Borrowers" (the "Promissory Note").

10. The Promissory Note is payable to both Joseph and Cassie Ciresi and is signed by Defendants Joseph and Cassie Ciresi as Holders.

11. Paragraph 10 of the Promissory Note provides that:

> The indebtedness and obligations evidenced by this Note are secured by a certain Pledge Agreement of the membership interests of PM III dated as of the date hereof, and of [*sic*] certain mortgages, security agreements, and fixture filing dated as of the date hereof or thereafter.

12. The Purchase Agreement includes as Exhibit C a "Membership Interest Pledge Agreement" (the "Pledge Agreement") signed by Mr. Dicks as Pledgor and by Joseph T. Ciresi as Secured Party.

13. The Pledge Agreement, in a paragraph captioned "Grant of Security Interest," provides that "Pledgor pledges and grants to Secured Party a continuing security interest in, and lien on, the Units."

14. A separate Security Agreement, which is not attached to the Purchase Agreement, is signed by Mr. Dicks individually and as a member of Pizzeria Management III LLC as Grantors, as well as by Joseph T. Ciresi as Secured Party (the "Security Agreement") and is attached hereto as Exhibit B.

15. The Security Agreement, which is "dated as of February 23, 2023", defines Mr. Dicks and Pizzeria Management III LLC collectively as "Grantor."

16. Paragraph 2 of the Security Agreement provides as follows:

> <u>Grant of Security Interest.</u> The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

all fixtures and personal property of every kind and nature including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letter of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities (including but not limited to all membership interests in PM III) and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty, or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

## COUNT ONE – AVOIDANCE OF SECURITY INTEREST IN MEMBERSHIP INTERESTS IN PIZZERIA MANAGEMENT III LLC AND THE 'COLLATERAL'

17. Plaintiff incorporates each of the preceding paragraphs as if fully re-written here.

18. The Membership Interests are, and at all times relevant hereto were, uncertificated securities.

19. Under the UCC, a security interest in uncertificated securities, and all other classes of property designated as "Collateral" in the Security Agreement may only be perfected by filing a financing statement with the Ohio Secretary of State pursuant to Ohio Revised Code Section 1309.312 or through control under Ohio Revised Code Section 1308.106.

20. Prior to the filing of the Bankruptcy Case on March 31, 2025, neither Josph T. Ciresi nor Cassie Ciresi had filed a financing statement with the Ohio Secretary of State to perfect any security interest held or claimed to be held by either of them in the Membership Interests. A true and correct copy of the records of the Ohio Secretary of State reflecting all financing statements filed against the Plaintiff is attached as Exhibit C.

21. No control agreement exists with respect to the Membership Interests.

22. Defendants do not have control of the Membership Interests.

4

23. Defendants have failed to properly perfect any lien or security interest in the Membership Interests or the Collateral under the law of the State of Ohio.

24. Pursuant to Section 544(a)(1) of the Bankruptcy Code, Mr. Dicks, as Debtor in Possession in this case, has the rights and powers of a hypothetical lien creditor as of the Petition Date.

25. Pursuant to UCC Sections 9-312 and 8-106 as adopted in Ohio (ORC §§ 1309.312 and 1308.106) and Section 544(a)(1) of the Bankruptcy Code, any liens held by Joseph T. Ciresi or Cassie Ciresi upon the Membership Interests or the Collateral, whether arising under the Pledge Agreement, the Security Agreement, or otherwise, are inferior to the rights and powers of Mr. Dicks as Debtor in Possession in this case.

26. Any liens held by Joseph T. Ciresi or Cassie Ciresi upon the Membership Interests or rhe Collateral are void as against Mr. Dicks as Debtor in Possession, and any claims against the Membership Interests or the Collateral held by Joseph T. Ciresi or Cassie Ciresi are unsecured claims.

## COUNT TWO – DETERMINATION OF EXTENT OF MORTGAGE

27. Plaintiff incorporates each of the preceding paragraphs as if fully re-written here.

28. Plaintiff owns a house and lot located in and around 13910 Claridon Troy Rd, Burton Ohio, PPN 04-093050 Lot 15 (the "Home"). The Home has a scheduled value of $353,700.

29. The Geauga County Auditor has a first priority statutory lien against the Home for unpaid real estate taxes in the approximate amount of $2,542.85.

30. On or about August 10, 2022, the Debtor entered into a loan and mortgage agreement with Guaranteed Rate, Inc. On August 11, 2022, MERS recorded a first priority mortgage against the Home that is now serviced and/or held by Lakeview Loan Servicing, LLC c/o ServiceMac,

LLC ("Lakeview"). Lakeview filed Proof of Claim No. 17 asserting that $337,248.76 remains owing on this loan as of the Petition Date.

31. On June 2, 2023, Defendant Joseph T. Ciresi caused the Ciresi Mortgage to be recorded against the Home. The approximate amount owed on the note secured by the Ciresi Mortgage is $148,896.28.

32. Pursuant to 11 USC § 506(a) Defendants' Ciresi Mortgage is only secured to the extent of the value of their interest in the estate's interest in in the Home, which is the fair market value of the Home less the amounts owed to the Geauga County Auditor and then to Lakeview on the first priority mortgage, or approximately $13,296.15. The balance owed on the note is a general unsecured claim against this bankruptcy estate.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment:

(1) pursuant to Count One avoiding any and all security interests or liens in the membership interests of Pizzeria Management III LLC  or the Collateral held or claimed to be held by either of Defendants Joseph T. Ciresi or Cassie Ciresi and declaring any such security interests or liens to be void;

(2) pursuant to Count Two determining the extent of the Ciresi Mortgage held or claimed to be held by either of Defendants Joseph T. Ciresi or Cassie Ciresi against the Home and declaring any such mortgage to be void over and above the value of the Home that secured such claim; and that the balance owed on such claim to be an unsecured claim against this estate; and

(3) such further judgment and relief to which Plaintiff may be entitled.

Respectfully Submitted,
/s/ Frederic P. Schwieg

Frederic P. Schwieg, Esq. (0030418)
Attorney at Law
19885 Detroit Rd #239
Rocky River, Ohio 44116
(440) 499-4506
fschwieg@schwieglaw.com
Attorney for Plaintiff Debtor-in-Possession

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), entered into on February 23, 2023 (the "**Effective Date**"), by and among Joseph T. Ciresi ("**Seller**"), and Jason Dicks, an individual (the "**Purchaser**").

## WITNESSETH:

WHEREAS, Seller owns 100% of the outstanding membership interest (the "**Membership Interest**") in Pizzeria Management III LLC, an Ohio limited liability company (the "**Company**"), that operates a store in the Zeppe's Tavern franchise system (the "**Store**") in the building located at 11110 Kinsman Road, Newbury Township, Ohio 44065 (the "**Building**");

WHEREAS, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth in this Agreement, such that, following the Closing (as defined below), seller will own 100% of the outstanding membership interests in the Company.

WHEREAS, Seller occupies premises in the Building (the "**Premises**"), upon which Seller operates the Store pursuant to a lease between Company and Newbury Center, LLC (the "**Landlord**") dated January 31, 2011 (the "**Lease**," a copy of which is attached as Exhibit A), Seller desires to assign Lease to Purchaser as member of Company, and Purchaser desires to assume and undertake Seller's obligations under the Lease;

WHEREAS, Purchaser and Zeppe's Tavern Franchise LLC ("**ZTF**"), prior to or concurrently herewith, executed a Franchise Agreement (the "**Franchise Agreement**") for the operation of the Store;

NOW THEREFORE, in consideration of the premises and mutual promises contained herein and in reliance upon the respective representations and warranties made to them, and intending to be legally bound hereby, the parties agree as follows:

### Section 1. Purchase and Sale of Assets; Lease of Premises

1.1 Upon the terms and conditions set forth in this Agreement, and in reliance upon the respective representations and warranties of the parties, Seller agrees to sell, assign, transfer, and deliver to Purchaser, and Purchaser agrees to purchase, acquire, and accept from Seller on the Closing Date (as defined in Section 6.1) the Membership Interests free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("Encumbrance"), other than as provided for in this Agreement and subject to the restrictions of the LLC Agreement, for the consideration specified in Section 2.

1.2 Further, on the Closing Date, and subject to the terms and conditions set forth herein, and in reliance on the representations and warranties of the parties, Seller agrees to assign the Lease for the Premises to Purchaser, subject to Landlord's consent (the "**Consent**"), and Purchaser agrees to accept and comply with the covenants, obligations and promises in the Lease.

### Section 2. Purchase Price

2.1 Purchase Price. Purchaser shall pay the sum of Five Hundred Seventy Five Thousand and 00/100 Dollars ($575,000.00) to Seller upon Closing (the "**Purchase Price**"), as payment for the Membership Interests, of which NONE has been previously paid to Seller by Purchaser. The

1



PLAINTIFF'S EXHIBIT

A

Purchase Price shall include: (i) payment of One Hundred Thousand and 00/100 Dollars ($100,000.00) to Seller at Closing; (ii) Purchaser entering into the cognovit note and mortgage, attached to this agreement as exhibit D, for One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) (iii) Purchaser entering into the promissory note ("**Note**"), attached to this Agreement as Exhibit B, for Three Hundred Twenty Five Thousand and 00/100 Dollars ($325,000.00) at Closing, which incorporates the Membership Interest Pledge Agreement. For purposes of clarity, the Purchase Price is exclusive of the initial franchise fee paid by Purchaser to the Seller pursuant to the Franchise Agreement.

2.2    Inventory. Purchaser shall also pay the sum related to all inventories of Seller placed in or at the Premises ("**Inventory**"). The value of the Inventory shall be determined by a count taken on the Premises that shall be conducted by the Seller and the Purchaser ("**Inventory Count**") between the close of business on the day preceding the Closing Date and the Closing Date. Seller will then submit the Inventory Count, in writing, to Purchaser for review. Upon receipt of the Inventory Count, Purchaser will, within three (3) business days, pay Seller for the Inventory outlined in the Inventory Count ("**Inventory Payment**").

## Section 3.    **Transactions at Closing**

On or prior to the Closing Date referred to in Section 6.1 hereof:

3.1    Lease. Purchaser and Seller shall execute the Consent, which shall take effect as of the Effective Date, subject to the written consent of the Landlord. Pursuant to the Consent, Purchaser shall assume all of Seller's obligations under the Lease, and Purchaser shall use its best efforts and maximum diligence to ensure that each obligation under the Lease is met in compliance with the terms of the Lease.

3.2    Assets. Seller shall sell, assign, and transfer to Purchaser, free and clear of all liabilities, obligations, security interests, and encumbrances, all of its right, title, and interest to the Membership Interests, including all of the Inventory, improvements, and equipment. All improvements, Inventory, and equipment are sold in their condition "AS IS" as of the date of the execution of this Agreement. SELLER MAKES NO EXPRESS WARRANTIES AND EXPRESSLY EXCLUDES AND DISCLAIMS ALL IMPLIED WARRANTIES WITH RESPECT TO ALL IMPROVEMENTS, INVENTORY AND EQUIPMENT SOLD HEREUNDER, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. PURCHASER'S EXCLUSIVE REMEDY AND SELLER'S EXCLUSIVE LIABILITY FOR ALL CLAIMS AS TO ANY IMPROVEMENTS, INVENTORY AND EQUIPMENT SOLD HEREUNDER IS LIMITED TO THE PURCHASE PRICE THEREFOR, PLUS SHIPPING COSTS, IF ANY, PURCHASER PAID. SELLER WILL NOT BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, MULTIPLIED, EXEMPLARY, OR PUNITIVE DAMAGES, WHETHER OR NOT CAUSED BY OR RESULTING FROM SELLER'S ACTIONS, INACTIONS, OR NEGLIGENCE, FOR ANY MATTER STATED IN THIS SECTION.

## Section 4.    **General Undertaking**

4.1    Consent of Landlord. Seller shall use commercially reasonable efforts to secure the consent of the Landlord to the Consent of the Lease as soon as possible after the Effective Date of this Agreement, and prior to the Closing. Seller makes no warranty or guarantee that such consent can be obtained, and the failure to obtain said consent shall not result in any liability of Seller to Purchaser. Such Landlord consent shall be a condition to the Closing hereunder.

4.2　Renegotiation of Lease. If desired by Purchaser and Seller, Seller agrees to use its commercially reasonable efforts to obtain an extension or renewal of the Lease on terms satisfactory to Seller and Purchaser. Seller makes no warranty or guarantee that an extension or renewal can be obtained or that it will endeavor to obtain the same; and Purchaser agrees and acknowledges that an extension or renewal of such Lease may not be desirable for Seller or Purchaser. Failure of Seller to obtain an extension or renewal of the Lease is at Purchaser's own risk and shall not result in any liability of Seller to Purchaser.

4.3　Permits or Approvals. Upon Closing, to the extent required by applicable law, Purchaser shall have obtained all necessary permits and approvals including, but not limited to, health permits and business licenses to operate that business which is the subject of this Agreement and the Franchise Agreement.

4.4　Liquor Permit. The Ohio Division of Liquor Control (the "**Division**") has issued that certain liquor permit to the Company for use in connection with the Business represented by permit number 6951786 (the "**Liquor Permit**"). The Liquor Permit currently acknowledges Seller as the sole member of the Company. Purchaser and Seller agree that they shall each undertake all commercially reasonable actions necessary to secure approval, including, but not limited to, the execution and filing of all forms and applications necessary with the Division to effectuate the transfer of the Liquor Permit from Seller to Purchaser upon Purchaser's full payment of the Purchase Price. On the Effective Date, Purchaser and Seller shall have entered into and delivered a Management Agreement (the "**Management Agreement**") in form and substance substantially as set forth on Exhibit C pursuant to which Purchaser shall operate and manage all matters relating to the sale of alcohol that require the Liquor Permit in connection with the Business prior to the approval of the transfer of the Liquor Permit by the Division from Seller to Purchaser. The Closing shall involve the transfer of all of the Membership Interests and assets, other than the Liquor Permit, which shall be transferred following Closing and the Effective Date upon Purchaser's fully payment of the Purchase Price and approval of the change in ownership by the Division.

**Section 5.　　Indemnity Against Claims**

5.1　Purchaser agrees to waive compliance with the requirements of any bulk sales law, bulk transfer provision or analogous requirements of the Uniform Commercial Code of any State ("**Bulk Sales Law**") that may apply to this purchase and sale.

5.2　Seller hereby agrees to defend, indemnify and hold Purchaser harmless against and from all claims or causes of action resulting directly from any failure to comply with an applicable provision of the Bulk Sales Law in connection with this transaction. Seller warrants that it is or shall pay all amounts rightfully due and owing to all trade and business creditors protected by any provision of a Bulk Sale Law, which is waived hereunder.

5.3　Purchaser hereby agrees to defend, indemnify and hold Seller and its affiliates harmless against any and all claims, demands, actions, causes of action, suits, liabilities, litigation costs, and expenses, including reasonable attorneys' fees, that arise from Purchaser's or its employees', agents', contractors' or invitees' presence on, use and occupancy of the Premises on or after the Closing Date.

5.4　Purchaser hereby agrees to indemnify and hold harmless Seller against all claims for any sales, transfer, or related taxes that may be imposed upon the transfer of any asset or the execution or recording of any documents executed pursuant to this Agreement.

**Section 6.**    **Closing**

6.1    <u>Date</u>. The Closing shall take place at the offices of Seller on the  1 3  day of  MARCH ,
2023, (the "**Closing**" or the "**Closing Date**").

6.2    <u>Amounts Due</u>. At Closing, Purchaser shall pay to Seller the Purchase Price under the terms set forth
in Section 2.1 and 2.2 hereof.

6.3    <u>Taxes and Miscellaneous Prorations</u>. Any sales, use, transfer or other tax or recording costs
imposed upon the transfer of Membership Interests shall be paid by Purchaser. All amounts paid
by Seller for permits, licenses or authorities shall be apportioned as of the Closing Date.

6.4    <u>Adjustments for Rents and Other Leasehold Charges</u>. Rent, common area charges, utility charges,
percentage rent, real estate taxes and any other similar items, which are unbilled, but which
obligations arise from or are related to the Lease of the Premises, shall be pro-rated as of the Closing
Date. Purchaser shall also reimburse Seller for the security deposit related to the Lease at Closing.

6.5    <u>Additional Documents to be Executed and Delivered at Closing</u>. At Closing, the party to be bound
thereby shall execute and deliver the following documents, execution and delivery of which shall
be express conditions precedent to the sale contemplated by this Agreement.

    6.5.1.    The Franchise Agreement and collateral documentation appended thereto, including the
Item 23 Receipt of ZTF's Franchise Disclosure Document;

    6.5.2.    Seller and Purchaser shall execute such instruments of Assignment, Assumption, Transfer
and Bills of Sale as may be necessary;

    6.5.3    As of the Closing, Purchaser and Seller shall enter into an Amended and Restated
Operating Agreement (the "Amended LLC Agreement"). The Amended LLC Agreement
of the Company shall be reviewed and approved by Seller;

    6.5.4    The Consent;

    6.5.5    The Note;

    6.5.6    The Membership Interest Pledge Agreement associated with the Note;

    6.5.7    Purchaser shall deliver to Seller a copy of the resolutions adopted by its shareholders,
members, or other owners, certified true and correct by an officer of Seller, authorizing it
to enter into this Agreement and the transactions herein contemplated.

**Section 7.**    **Representation and Warranties of Seller**

Seller warrants and represents the following:

7.1    <u>Authority</u>. Seller is a corporation, duly formed, validly existing, and in good standing under the
laws of Ohio. Seller has full and absolute power and authority to enter into this Agreement and all
ancillary documents delivered pursuant hereto, and to assume and perform all of its obligations
hereunder. The execution and delivery of this Agreement and the performance by the Seller of its
obligations hereunder have been duly authorized by all requisite corporate action and no further

action or approval is required in order to constitute this Agreement as a binding and enforceable obligation of the Seller.

7.2     Ownership of Membership Interests. Seller is the sole legal, beneficial, recorded, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever subject to the restrictions under the LLC Agreement.

7.3     Seller's Compliance. Except as otherwise set forth herein, neither the execution and delivery of this Agreement nor the consummation of any material transaction contemplated hereby requires the consent or approval of a third party or will conflict with, or (with or without the giving of notice or the passage of time or both) result in a breach of, any of the terms, conditions, or provisions of any material law, regulation, judicial order, or administrative order, writ, injunction, judgment, or decree of any court or governmental instrumentality, or of the corporate charter or by laws, of Seller, or the provisions of any material (i) note of which Seller is the maker, (ii) indenture, (iii) agreement, or (iv) other instrument by which it is bound. Furthermore, Seller has no knowledge or information that there are any actions, suits, proceedings (whether or not purportedly on behalf of Seller) pending or threatened which would materially adversely affect the aforementioned Assets or the Premises, at law or in equity or by any federal, state, municipal, or other governmental department, commission, board, agency, or instrumentality, domestic or foreign.

7.4     Premises. Seller has no knowledge or information that Company's use of the Premises is in violation of any applicable material laws, ordinances, or regulations. Seller has not received notice to the contrary from government authorities at any level.

7.5     Lease. Company is the lessee of the Premises, is in full compliance with the material terms of the Lease, and has not received any notice of default with respect to the Lease.

7.6     Binding on Seller. The execution and delivery of this Agreement and all documents executed in connection herewith by Seller and the consummation of the transaction contemplated hereby and thereby will be valid and binding upon the Seller.

7.7     Cooperation. Seller agrees to make commercially reasonable efforts to facilitate the transfer of the Assets under this Agreement and to that end, agrees to execute any and all such additional documents as are required to carry out the terms and provisions of this Agreement, provided such document(s) are in form and substance reasonably satisfactory to Seller.

**Section 8.      Representations and Warranties of Purchaser**

8.1     Power and Authority. Purchaser has full and absolute power and authority to enter into this Agreement and all ancillary documents delivered pursuant hereto, and to assume and perform all of their obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of its obligations hereunder require no further action, approval or consents by any third persons in order to constitute this Agreement as a binding and enforceable obligation of Purchaser.

8.2     Purchaser's Compliance. Except as otherwise set forth herein, neither the execution and delivery of this Agreement nor the consummation of any material transaction contemplated hereby requires the consent or approval of a third party or will conflict with, or (with or without the giving of notice or the passage of time or both) result in a breach of, any of the terms, conditions, or provisions of any material law, regulation, judicial order, or administrative order, writ, injunction, judgment, or decree of any court or governmental instrumentality of Purchaser, or the provisions of any material

(i) note of which Purchaser is the maker, (ii) indenture, (iii) agreement, or (iv) other instrument by which it is bound. Furthermore, Purchaser has no knowledge or information that there are any actions, suits, proceedings, pending or threatened, that would materially adversely affect the ability of Purchaser to lease the Premises or acquire the Membership Interests, at law or in equity, by any federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign.

8.3     Legal Action Against Purchaser. There are no material judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record nor any legal action, suit or other legal administrative proceeding pending or, to the best of either of Purchaser's knowledge, threatened before any court or administrative agency.

8.4     Bankruptcy or Debt of Purchaser. Purchaser has not committed an act of bankruptcy and is financially solvent, able to meet its obligations as they become due, and has made adequate provision for the payment of its debts and liabilities.

8.5     Binding on Purchaser. The execution and delivery of this Agreement, the Membership Interest Pledge Agreement, and all documents executed in connection herewith by Purchaser and the consummation of the transaction contemplated hereby and thereby will be valid and binding upon the Purchaser.

## Section 9.     Joint and Several Liability

The Purchaser agrees to be liable for the performance of all of the obligations under this Agreement.

## Section 10.     Survival of Covenants, Representations, Warranties and Guarantees

All covenants, representations, guarantees, and indemnities contained herein, or in any exhibit attached hereto, or in any Closing documents shall survive the Closing.

## Section 11.     Broker

The parties represent and warrant to each other that they have not dealt with any broker in connection with this transaction, and each party shall indemnify, defend, and hold the other harmless from and against any and all costs, expenses (including reasonable attorneys' fees) and liabilities arising from any claims made for broker's commission or like compensation in connection with this transaction, provided that such claims result from any act of the indemnifying party or its representatives.

## Section 12.     Assignment

Purchaser shall not have the right to assign its rights and interest in and to this Agreement without the prior written consent of the Seller. Seller may assign its rights and interest in and to this Agreement at any time for any reason.

## Section 13.     General

13.1     Notices. All notices under this Agreement shall be in writing and shall be deemed duly given if delivered in person or if mailed by certified mail, return receipt requested or via nationally recognized overnight courier service to the parties at the following address:

If to Seller to:

Zeppe's Tavern Franchise LLC
25780 Miles Road, Unit A
Bedford Heights, Ohio 44146
ATTN: Cassie Ciresi

With a copy to:

Shumaker, Loop & Kendrick, LLP
1000 Jackson Street
Toledo, Ohio 43604
ATTN: Brian N. McMahon, Esq.

If to Seller to:

Jason Dicks
13910 Claridon Troy Road
Burton, Ohio 44021

With a copy to:

_____
_____
_____
_____

13.2     Costs. Except as otherwise provided in this Agreement, each party shall bear its own costs including attorneys' fees in connection with the preparation of this Agreement and the transactions contemplated hereby.

13.3     **Applicable Law and Waiver of Jury Trial. This Agreement shall be interpreted and construed under the laws of the State of Ohio, which laws shall prevail in the event of any conflict of law. The parties agree that any action brought by Purchaser or any Principal against Seller in any court, whether federal or state, shall be brought only within the State of Ohio in the judicial district in which Seller then resides, provided further that, if subject matter jurisdiction exists, such action shall only be brought in the federal district courts of the Northern District of Ohio; and the parties waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision. The parties also agree that the Seller may bring any action against the Purchaser in any court, whether federal or state, within the State of Ohio. If Seller brings an action against Purchaser or any Principal in any state or federal court located within the State of Ohio in the judicial district in which Seller has its principal place of business, Purchaser accepts generally and unconditionally the jurisdiction and venue of the aforesaid courts and waives any defense of *forum non conveniens*. Seller and Purchaser agree that in any litigation, suit, action, counterclaim, or proceeding, whether at law or in equity, which arises out of, concerns, or relates to this Agreement, any and all transactions contemplated hereunder, the performance of this Agreement, or otherwise, trial shall be to a court of competent jurisdiction and not to a jury. Seller and Purchaser hereby irrevocably waive any right either party may have to a trial by jury. Either Seller or Purchaser may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of Seller or Purchaser of the waiver of their right to trial by jury.**

13.4     **Entire Agreement**

13.4.1.  This instrument contains the entire agreement between the parties with respect to the transactions contemplated herein and supersedes any prior agreements or understandings relating to its subject matter, either written or verbal, between the parties; provided, that

nothing in this instrument is intended to disclaim the representations made in ZTF's Franchise Disclosure Document.

13.4.2. All captions in this Agreement are intended solely for the convenience of the parties, and shall be deemed not to affect the meaning or construction of any provision hereof.

13.5    <u>Partial Invalidity</u>. If any terms, covenants, or conditions of this Agreement shall be invalid or unenforceable, the remainder of this Agreement shall nevertheless survive and be binding upon the parties hereto.

13.6    <u>Binding Effect</u>. Subject to the provisions governing assignment, this Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, successors, and assigns of the respective parties hereto.

13.7    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall be considered one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, as of the day and year first above written.

**SELLER**

_____
Joseph T. Ciresi

**PURCHASER**

_____
Jason Dicks

**EXHIBIT A**
Lease

**EXHIBIT B**
**Promissory Note**

# PROMISSORY NOTE

$325,000.00                                                    February 23, 2023
Principal Amount                                                Newbury, Ohio


For value received, the receipt and sufficiency of which are hereby acknowledged, PIZZERIA MANAGEMENT III LLC, an Ohio limited liability company ("PM III") and JASON DICKS, an individual ("Jason" and together with PM III, "Borrower"), hereby promises to pay to the order of Joseph T. Ciresi, an individual ("Joseph"), and Cassie Ciresi, an individual ("Cassie"), both with an address of 25780 Miles Road, Suite A, Bedford Heights, Ohio 44146 ( Joseph and Cassie, collectively, the "Holder"), or at such other place as Holder hereof may, from time to time, designate in writing, the principal balance of Three Hundred Twenty Five Thousand and 00/100 Dollars ($325,000.00), payable at the times and on the terms as hereinafter provided in this promissory note (this "Note").

## Payment Terms

1.      Principal and interest shall be payable as follows:

(a)      Interest on the outstanding unpaid principal balance of this Note shall accrue at an annual fixed rate of 9.0%, and shall be calculated at a fifteen (15) year amortization schedule, on the basis of a year of 365 days and actual days elapsed.

(b)      The monthly principal and interest payments and one-time balloon payment shall be made in accordance with the following:

(i)      Beginning on the first day of the next month from the date hereof, and on the first day of each succeeding calendar month through the first twelve (12) months, Borrower shall make monthly payments to Holder in the amount of $2,437.50;

(ii)      Beginning on the first day of the thirteenth (13th) month from the date hereof, and on the first day of each succeeding calendar month until the Maturity Date (as defined below), Borrower shall make monthly payments to Holder in the amount of $3,296.37, or more if Borrower so chooses.

(ii)      All unpaid principal, together with any then unpaid and accrued interest and any other amounts payable hereunder, shall be due and payable on the earlier of (a) the Maturity Date; or (b) when, upon the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Holder or made automatically due and payable, in each case, in accordance with the terms hereof.

(c)      The "Maturity Date" of this Note shall mean the earlier of: (i) the date that is 24 months from the date hereof;  or (ii) (x) the sale, lease, license or transfer, in a single transaction or a series of transactions, of all or substantially all of Borrower's assets, (y) the sale or transfer, in a single transaction or a series of transactions, any of the membership interests of Borrower, or (z) the issuance by Borrower of equity, whether in one or more transactions, which individually or in the aggregate results in the ownership, following such transaction or transactions, by the present membership interest holders of Borrower of less than 100% of the issued and outstanding equity of Borrower.

## Allocation of Payments

2.  Any payments received by Holder of this Note shall be applied first against any interest then due, then against the unpaid principal amount of this Note.

## Prepayments of Principal and Interest

3.  Borrower shall be entitled to prepay the outstanding principal balance of this Note, without penalty or premium, prior to maturity in whole or in part upon five (5) days' notice. Early payments of principal will be accompanied by accrued and unpaid interest to the date of such prepayment on such prepaid principal.

## Default

4.  Borrower shall be in default of this Note if any Event of Default occurs. Any one or more of the following events shall constitute an "Event of Default":

   (a)  Borrower fails to pay when due any interest on or principal of this Note and the same shall go unremedied for a period of fifteen (15) days;

   (b)  Borrower becomes insolvent, a receiver is appointed for any part of its property, it makes an assignment for the benefit of creditors or any proceeding is commenced either by or against it under any bankruptcy or insolvency laws; or

   (c)  Borrower or an affiliate of Borrower defaults under any other promissory note executed by Borrower or such affiliate and such default shall not be cured within the cure period provided for therein.

5.  Without prejudice to any of Holder's other remedies under this Note or otherwise at law or equity, at Holder's election, without notice or demand, Borrower shall pay interest at the rate per annum equal to eighteen percent (18%) (the "Default Rate") on the outstanding balance of this Note during the period that any Event of Default exists, on past due interest on this Note, on all other amounts payable to Holder by Borrower in connection with this Note and on any unsatisfied judgment on this Note. In no event, however, shall the interest rate on this Note exceed the highest rate permitted by law. The Default Rate is for the purpose of defraying the expenses incurred in connection with handling and processing and the loss of use of such delinquent payments, which expenses would be impracticable to quantify, and Borrower acknowledges that the Default Rate is a reasonable estimate of such expenses. Unpaid Default Rate payments shall be added to and become part of the unpaid principal under this Note and accrue interest as described hereunder and shall be added to any subsequent payments due under this Note.

## Enforcement

6.  Upon the occurrence of an Event of Default described in Section 4 above, the principal amount of this Note together with accrued interest thereon shall become immediately due and payable, without presentment, demand, notice protest or other requirements of any kind (of all which are expressly waived by Borrower). Upon the occurrence of any other Event of Default, Holder may, at any time, declare the unpaid principal balance hereof and all interest then accrued hereon to be immediately due and payable. Such principal and interest shall thereupon be immediately due and payable in cash. Holder may engage advisors, agents and representatives, including legal advisors, to help collect this Note if Borrower fails to pay, and Borrower shall bear, and indemnify Holder for, all reasonable costs, fees and expenses related to such engagements.

7. In case any one or more Events of Default shall happen and be continuing, Holder may proceed to protect and enforce its rights by suit in equity, action at law or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Note, or in aid of the exercise of any power granted in this Note, or may proceed to enforce any other legal right which Holder may have, all of which it hereby expressly reserves.

8. Presentment for payment, demand, notice of demand, notice of non-payment, notice of dishonor, protest, notice of protest and diligence in bringing suit against any party hereto are hereby waived by Borrower.

9. All rights, remedies or powers hereby conferred upon Holder shall, to the extent not prohibited by law, be deemed cumulative and not exclusive of any other thereof, or any other rights, remedies or powers available to Holder. No delay or omission of Holder to exercise any right, remedy or power shall impair any such right, remedy or power or shall be construed to be a waiver of an Event of Default or an acquiescence therein. Any right, remedy or power conferred upon Holder hereunder may be exercised from time to time, independently or concurrently, and as often as it shall deem expedient. No waiver of any Event of Default by Holder shall extend to or shall affect any subsequent Event of Default. No single or partial exercise of any right, remedy or power by Holder shall preclude further exercise thereof by Holder. Acceptance by Holder of partial payments following acceleration of the indebtedness evidenced hereby shall not constitute a waiver by Holder of the acceleration of such indebtedness.

## Security

10. The indebtedness and obligations evidenced by this Note are secured by a certain Pledge Agreement of the membership interests of PM III dated as of the date hereof, and of certain mortgages, security agreements and fixture filing dated as of the date hereof or thereafter.

## Miscellaneous

11. Nothing contained in this Note, or in any other document relating hereto, shall be construed or so operate as to require Borrower to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law. Any interest or other charge paid by Borrower in excess of the highest rate permissible under applicable law shall be automatically credited against and in reduction of the principal balance, and any portion of said excess that exceeds the principal balance shall be paid by Holder to Borrower.

12. If any provision (or any part of any provision) contained in this Note shall for any reason be held or deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, and this Note shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, and the remaining provisions of this Note shall remain in full force and effect.

13. Time will be of the essence with respect to all of Borrower's obligations under this Note. No amendment, supplement, modification, waiver, discharge or other change to this Note shall be binding unless executed in writing by both parties to be bound thereby. No waiver of any of the provisions of this Note shall be deemed or shall constitute a waiver of any other provision of this Note, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

14. This Note shall be governed by the internal substantive laws of the State of Michigan, without regard to any conflicts of laws provisions.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the day and year first written above.

**HOLDER:**                                        **BORROWER:**

                                                   PIZZERIA MANAGEMENT III LLC

_____                   _____
Joseph T. Ciresi                                   Jason Dicks, *Member*

_____                   _____
Cassie Ciresi                                      Jason Dicks

**EXHIBIT A**

Amortization Schedule

(See attached)

## Amortization Schedule

| | | | |
|---|---|---|---|
| Loan Amount | | | 325,000 |
| Annual Interest Rate | | | 9% |

| Payment Due Date | Principal | Interest | Payment Due |
|---|---|---|---|
| March 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| April 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| May 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| June 1,2023 | $0 | $2,437.50 | $2,437.50 |
| July 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| August 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| September 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| October 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| November 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| December 1, 2023 | $0 | $2,437.50 | $2,437.50 |
| January 1, 2024 | $0 | $2,437.50 | $2,437.50 |
| February 1, 2024 | $0 | $2,437.50 | $2,437.50 |
| March 1, 2024 | $858.87 | $2,437.50 | $3,296.37 |
| April 1, 2024 | $865.31 | $2,431.06 | $3,296.37 |
| May 1, 2024 | $871.80 | $2,424.57 | $3,296.37 |
| June 1, 2024 | $878.34 | $2,418.03 | $3,296.37 |
| July 1, 2024 | $884.93 | $2,411.44 | $3,296.37 |
| August 1, 2024 | $891.56 | $2,404.81 | $3,296.37 |
| September 1, 2024 | $898.25 | $2,398.12 | $3,296.37 |
| October 1, 2024 | $904.99 | $2,391.38 | $3,296.37 |
| November 1, 2024 | $911.78 | $2,384.59 | $3,296.37 |
| December 1, 2024 | $918.61 | $2,377.76 | $3,296.37 |
| January 1, 2025 | $925.50 | $2,370.87 | $3,296.37 |
| February 1, 2025 | $932.44 | $2,363.93 | $3,296.37 |
| March 1, 2025 | $314,257.65 | $0 | $314,257.65 |

*[Handwritten annotation next to April 1, 2023 row:]* First payment 4/1 — CMW CMW

**EXHIBIT C**
**Membership Interest Pledge Agreement**

# MEMBERSHIP INTEREST PLEDGE AGREEMENT

THIS MEMBERSHIP INTEREST PLEDGE AGREEMENT (this "**Agreement**") is made effective on February 23, 2023, by and between Jason Dicks, an individual with an address of 13910 Claridon Troy Road, Burton, Ohio 44021 (**Pledgor**"), and Joseph T. Ciresi, an individual with an address of 25780 Miles Road, Suite A, Bedford Heights, Ohio 44146 ("**Secured Party**").

WHEREAS, Pledgor and Secured Party, among others, are parties to that certain Membership Interest Purchase Agreement of even date herewith ("Purchase Agreement"), whereby Secured Party has agreed to sell to Pledgor, and Pledgor has agreed to purchase and redeem from Secured Party, membership interest units in Pizzeria Management III LLC, an Ohio limited liability company (the "Company"), equal to a 100% interest in the Company (the "Units");

WHEREAS, Pledgor has agreed to pay the purchase price for the Units by delivering to Secured Party a Promissory Note of even date herewith, in the principal amount of Three Hundred Twenty Five Thousand and 00/100 Dollars ($325,000.00) (the "**Note**"); and

WHEREAS, in order to secure Pledgor's obligations under the Note, Pledgor has agreed to pledge and grant to Secured Party a security interest in, and lien on, the Units, pursuant to the terms and conditions of this Agreement.

THEREFORE, for valuable consideration received, the parties agree as follows:

Grant of Security Interest. Subject to Applicable Law (as defined below), as security for the prompt and complete payment and performance when due of all liabilities, obligations or indebtedness owing by Pledgor to Secured Party under the Note (collectively, the "**Obligations**"), Pledgor pledges and grants to Secured Party a continuing security interest in, and lien on, the Units. For so long as the Units consist of an uncertificated security or a security in book entry form, Pledgor shall reasonably cooperate in perfecting Secured Party's security interest thereon in accordance with Applicable Law.

Delivery of Transfer Powers. Concurrent with the execution of this Agreement, Pledgor shall deliver to Secured Party an undated assignment duly executed in blank transferring the Units to Secured Party, subject to Applicable Law, substantially in the form attached hereto as Exhibit A. In the event that Pledgor should ever acquire or receive certificates, securities, instruments or other documents evidencing the Units, Pledgor shall deliver to and deposit with Secured Party in pledge, all such certificates, securities, instruments or other documents that evidence the Units, together with undated assignments, instruments or other documents signed in blank by Pledgor.

Dividends and Distributions. Upon an Event of Default (as such term is defined in the Note), any and all dividends and distributions that may be made or due, or may become due, in respect of the Units, shall be distributed to Secured Party, subject to Applicable Law.

Voting and Other Rights. Upon an Event of Default, subject to Applicable Law, Secured Party shall have the right to exercise any and all voting rights in respect of the Units on any company matter.

Covenants and Warrants. Pledgor covenants that, until the Obligations have been Paid-in-Full (as defined below), Pledgor shall not sell, convey or otherwise dispose of any of the Units or any interest therein, or create, incur or permit to exist any pledge, mortgage, lien, charge, encumbrance or any security interest whatsoever in or with respect to any of the Units except for those created hereby and by those created in connection with the other transactions contemplated under the Purchase Agreement. Pledgor warrants, at Pledgor's expense, that Pledgor will defend Secured Party's right, title, and security interest in and to the Units against the claims of any person.

Other Rights with Respect to the Units. In addition to all other rights with respect to the Units granted to Secured Party hereunder, at any time and from time to time, during the continuation of an Event of Default, Secured Party, at its option, subject to Applicable Law, and at the expense of Pledgor, may (a) transfer into its own name all or any part of the Units, thereafter receiving in such name any dividends, income or other distributions upon the Units to which Secured Party may be entitled; (b) take control of and manage all or any of the Units; (c) apply to the payment of any of the Obligations, whether any be due and payable or not, any moneys, including cash dividends, distributions and other income from any Units, now or hereafter in the hands of Secured Party, on deposit or otherwise, belonging to Pledgor, as Secured Party in its sole discretion shall determine; and (d) do anything that Pledgor is required but fails to do hereunder.

Event of Default; Remedies. Upon the occurrence of an Event of Default, Secured Party, in its sole and absolute discretion, shall have the right to exercise any rights or remedies provided by law, including, without limitation, the rights and remedies of a secured party under the Ohio Revised Code, as amended from time to time (the "**Code**").

Application of Proceeds upon Disposition of Units. Any cash dividend or distribution received by Secured Party and the proceeds of any disposition of the Units by Secured Party shall be applied as follows:

1.  first, to the costs and expenses incurred in connection with enforcing this Agreement or incidental thereto or to the care or safekeeping of any of the Units or in any way relating to Secured Party's rights, including reasonable attorneys' fees and legal expenses;
2.  second, to the satisfaction of the Obligations;
3.  third, to the payment of any other amounts required by Applicable Law; and
4.  fourth, to Pledgor to the extent of any surplus proceeds.

Secured Party's Duties. The powers conferred on Secured Party hereunder are solely to protect its interest in the Units and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Units in its possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to the Units or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to the Units.

Further Assurances. Prior to or concurrently with the execution of this Agreement, and thereafter at any time and from time to time upon the reasonable request of Secured Party, Pledgor shall execute and deliver to Secured Party all financing statements, continuation financing statements, collateral assignments, certificates and documents of title, affidavits, reports, notices, schedules of account, letters of authority, further pledges, powers of attorney and all loan

documents (collectively, the "**Security Documents**") that Secured Party may reasonably request, in form and substance reasonably satisfactory to Secured Party, and take such other actions that Secured Party may reasonably request, to perfect and continue perfected and to create and maintain the first priority status of Secured Party's security interest in the Units and to fully consummate the transactions contemplated under this Agreement.

Continuing Security Interest. This Agreement shall create a continuing security interest in the Units and shall remain in full force and effect until the Obligations are Paid-in-Full. Except as otherwise provided in the Note, when the Obligations have been Paid-in-Full, the security interests granted herein shall automatically terminate and all rights to the Units shall revert to Pledgor. Upon any such termination, Secured Party will, at Pledgor's expense, promptly execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination. Such documents shall be prepared by Pledgor and shall be in form and substance reasonably satisfactory to Secured Party. For purposes of this Agreement, the term "Paid-in-Full" shall mean the payment in full in cash (or other consideration acceptable to Secured Party) of all Obligations.

Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given: (a) on the date of delivery if delivered personally; (b) on the date sent by facsimile (with confirmation of transmission) or electronic mail; (c) if dispatched via a nationally recognized overnight courier service (delivery receipt requested), on the later of (i) the first business day following the date of dispatch, or (ii) the scheduled date of delivery by such service; or (d) on the fifth business day following the date of mailing, if mailed by registered or certified mail, return receipt requested, postage prepaid to the party to receive such notice, at such party's address as set forth in the preamble of this Agreement (or such subsequent address established by a party by due notice in accordance with this provision).

Waiver. The failure of Secured Party to require the performance of any term or obligation of this Agreement, or the waiver by Secured Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

Cumulative Remedies. The remedies herein provided are cumulative and not exclusive of any remedies provided under the Note or by law. Pledgor waives any right to require Secured Party to proceed against any other person or entity or to exhaust any other remedy available to Secured Party.

Binding Effect. This Agreement will be binding upon, inure to the benefit of and be enforceable by, the successors and assigns of the parties hereto.

Expenses. Each party shall pay all of its own costs and expenses, including legal, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation and performance of this Agreement.

Entire Agreement; Amendment. This Agreement, together with the attached Exhibit, constitutes the entire agreement and understanding between the parties and supersedes all other agreements and understandings, both written and oral, of the parties relating to the subject matter

hereof. This Agreement may only be amended by an instrument in writing signed by the parties to this Agreement.

Governing Law; Venue. This Agreement will be governed by and construed in accordance with the laws of the State of Ohio, without regard to any conflict of laws or choice of law provisions. Hereinabove, the laws of the State of Ohio and the regulatory oversight by any agencies thereof shall be referred to as "Applicable Law". The parties hereby agree that any legal or equitable action or proceeding with respect to this Agreement shall be brought only in any state court in the State of Ohio, and each of the parties hereby submits to and accepts generally and unconditionally the jurisdiction of those courts with respect to such party and such party's property and irrevocably consents to the service of process in connection with any such action or proceeding by personal delivery or by the mailing thereof by registered or certified mail, postage prepaid to the party's address first set forth above.

Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.

*[Signature Page Follows]*

WHEREFORE, the parties have executed this Agreement effective as of the date first above written.

**SECURED PARTY:**

Joseph T. Ciresi

**PLEDGOR:**

Jason Dicks

**EXHIBIT A**

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, JASON DICKS, an individual ("**Assignor**"), and subject to Applicable Law (as defined in the Membership Interest Pledge Agreement, dated as of even date herewith), hereby assigns, transfers and conveys to JOSEPH T. CIRESI, an individual ("**Assignee**"), membership interest units (the "**Units**") owned by Assignor in Pizzeria Management III LLC, an Ohio limited liability company (the "Company"), in an amount equal to 100% of the outstanding, issued membership Units of Assignor.

PIZZERIA MANAGEMENT III LLC

_____
Jason Dicks

Dated: 3 - 7 - 2023

**EXHIBIT D**
**Cognovit Note and Mortgage Note**

<u>MORTGAGE NOTE</u>

$150,000.00 $\qquad$ March 8 , 2023

FOR VALUE RECEIVED, the undersigned, **Jason Dicks** (hereinafter "Maker"), promises to pay to the order of **Joseph T. Ciresi** (hereinafter "Holder"), the principal sum of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), plus interest at the rate of twelve percent (12.00%) per annum, amortized over thirty (30) years, in equal monthly installments of One Thousand Five Hundred Forty-two and 92/100 Dollars ($1,542.92), according to the amortization schedule attached hereto, beginning on April 1, 2023, with a balloon payment of ($148,842.33) after the twenty-seventh (27th) payment. If all amounts due and owing hereunder are not paid in full when due, Maker shall be in default. Maker shall have the right at any time to prepay the principal amount and any accrued and unpaid interest outstanding in whole, without penalty.

In the event of any default in the payment of this Note and if suit is brought hereon, interest shall accrue on the unpaid balance at the rate of twelve percent (12%) per annum and the Holder hereof shall be entitled to collect in such proceeding all reasonable costs and expenses of suit, including reasonable attorney fees.

Payment on this Note shall be made in lawful money of the United States of America to Joseph T. Ciresi at 25780 Miles Road, Suite A, Bedford Heights, Ohio 44146, or at such other place as Holder, or any subsequent Holder, shall have designated to the undersigned.

This Note shall be secured by the following real property pursuant to a Mortgage Deed executed contemporaneously herewith:

13910 Claridon Troy Road, Burton, Ohio 44021
Permanent Parcel No. 04-093050

Presentment, notice of dishonor and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers and shall be binding upon them and their heirs, personal representatives, successors and assigns.

The Maker and endorsers hereof hereby authorize any attorney at law to appear in any court of record of the State of Ohio or any other state in the United States at any time after this Note becomes due, whether by acceleration or otherwise, and to waive the issuing and service of process and confess a judgment in favor of the legal holder hereof against the Maker and endorsers, or

either or any one or more of them, for the amount of principal and interest then appearing due upon this Note, together with costs of suit, and to release all errors and waive all rights of appeal. The undersigned waives any conflict of interest in any Holder's attorney confessing judgment against the undersigned pursuant to the foregoing warrant of attorney and further agrees that the attorney confessing judgment pursuant to the foregoing warrant of attorney may receive a legal fee or other thing of value from the Holder.

The Maker warrants and represents that the indebtedness evidenced by this Note does not constitute a "Consumer Loan" or "Consumer Transaction" as defined, respectively, in §2323.13(E)(1) and §2323.13(E)(2) of the Ohio Revised Code. Maker consents to the jurisdiction of the State of Ohio.

**WARNING: BY SIGNING THIS PAPER, YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME, A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE, AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR, WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

**MAKER:**

JASON DICKS

2

STATE OF OHIO, )
                        ) SS:
COUNTY OF Geauga . )

BEFORE ME, a Notary Public in and for said county and state, personally appeared the above-named **Jason Dicks**, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Newbury , Ohio, this 8th day of March , 2023.



**Brian Cain**
Notary Public, State of Ohio
My Commission Expires 1-2-2027
Registered in Geauga County

_____
NOTARY PUBLIC

*This instrument prepared by:*
George J. Argie, Esq.
6449 Wilson Mills Road
Mayfield Village, Ohio   44143
440-449-3333

3

# Amortization Schedule

| Amount of Loan | Annual Interest Rate (in percent) | Length of Loan (in months) |
|---|---|---|
| 150000 | 12 | 360 |

UPDATE TABLE

| Total Payments $555,450.80 | Total Interest $405,450.80 | Number of Monthly Payments 360 | Monthly Payment $1,542.92 |
|---|---|---|---|

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 1 | $150,000.00 | $1,500.00 | $42.92 | $149,957.08 | $1,500.00 | $1,542.92 |
| 2 | $149,957.08 | $1,499.57 | $43.35 | $149,913.73 | $2,999.57 | $3,085.84 |
| 3 | $149,913.73 | $1,499.14 | $43.78 | $149,869.95 | $4,498.71 | $4,628.76 |
| 4 | $149,869.95 | $1,498.70 | $44.22 | $149,825.73 | $5,997.41 | $6,171.68 |
| 5 | $149,825.73 | $1,498.26 | $44.66 | $149,781.07 | $7,495.66 | $7,714.59 |
| 6 | $149,781.07 | $1,497.81 | $45.11 | $149,735.96 | $8,993.48 | $9,257.51 |
| 7 | $149,735.96 | $1,497.36 | $45.56 | $149,690.40 | $10,490.84 | $10,800.43 |
| 8 | $149,690.40 | $1,496.90 | $46.01 | $149,644.39 | $11,987.74 | $12,343.35 |
| 9 | $149,644.39 | $1,496.44 | $46.48 | $149,597.91 | $13,484.18 | $13,886.27 |
| 10 | $149,597.91 | $1,495.98 | $46.94 | $149,550.97 | $14,980.16 | $15,429.19 |
| 11 | $149,550.97 | $1,495.51 | $47.41 | $149,503.56 | $16,475.67 | $16,972.11 |
| 12 | $149,503.56 | $1,495.04 | $47.88 | $149,455.68 | $17,970.71 | $18,515.03 |
| 13 | $149,455.68 | $1,494.56 | $48.36 | $149,407.32 | $19,465.26 | $20,057.95 |
| 14 | $149,407.32 | $1,494.07 | $48.85 | $149,358.47 | $20,959.34 | $21,600.86 |
| 15 | $149,358.47 | $1,493.58 | $49.33 | $149,309.14 | $22,452.92 | $23,143.78 |
| 16 | $149,309.14 | $1,493.09 | $49.83 | $149,259.31 | $23,946.01 | $24,686.70 |
| 17 | $149,259.31 | $1,492.59 | $50.33 | $149,208.99 | $25,438.61 | $26,229.62 |
| 18 | $149,208.99 | $1,492.09 | $50.83 | $149,158.16 | $26,930.70 | $27,772.54 |
| 19 | $149,158.16 | $1,491.58 | $51.34 | $149,106.82 | $28,422.28 | $29,315.46 |
| 20 | $149,106.82 | $1,491.07 | $51.85 | $149,054.97 | $29,913.35 | $30,858.38 |
| 21 | $149,054.97 | $1,490.55 | $52.37 | $149,002.60 | $31,403.90 | $32,401.30 |
| 22 | $149,002.60 | $1,490.03 | $52.89 | $148,949.71 | $32,893.92 | $33,944.22 |
| 23 | $148,949.71 | $1,489.50 | $53.42 | $148,896.28 | $34,383.42 | $35,487.13 |
| 24 | $148,896.28 | $1,488.96 | $53.96 | $148,842.33 | $35,872.38 | $37,030.05 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 25 | $148,842.33 | $1,488.42 | $54.50 | $148,787.83 | $37,360.81 | $38,572.97 |
| 26 | $148,787.83 | $1,487.88 | $55.04 | $148,732.79 | $38,848.68 | $40,115.89 |
| 27 | $148,732.79 | $1,487.33 | $55.59 | $148,677.20 | $40,336.01 | $41,658.81 |
| 28 | $148,677.20 | $1,486.77 | $56.15 | $148,621.05 | $41,822.78 | $43,201.73 |
| 29 | $148,621.05 | $1,486.21 | $56.71 | $148,564.35 | $43,308.99 | $44,744.65 |
| 30 | $148,564.35 | $1,485.64 | $57.28 | $148,507.07 | $44,794.64 | $46,287.57 |
| 31 | $148,507.07 | $1,485.07 | $57.85 | $148,449.22 | $46,279.71 | $47,830.49 |
| 32 | $148,449.22 | $1,484.49 | $58.43 | $148,390.80 | $47,764.20 | $49,373.40 |
| 33 | $148,390.80 | $1,483.91 | $59.01 | $148,331.79 | $49,248.11 | $50,916.32 |
| 34 | $148,331.79 | $1,483.32 | $59.60 | $148,272.18 | $50,731.43 | $52,459.24 |
| 35 | $148,272.18 | $1,482.72 | $60.20 | $148,211.99 | $52,214.15 | $54,002.16 |
| 36 | $148,211.99 | $1,482.12 | $60.80 | $148,151.19 | $53,696.27 | $55,545.08 |
| 37 | $148,151.19 | $1,481.51 | $61.41 | $148,089.78 | $55,177.78 | $57,088.00 |
| 38 | $148,089.78 | $1,480.90 | $62.02 | $148,027.76 | $56,658.68 | $58,630.92 |
| 39 | $148,027.76 | $1,480.28 | $62.64 | $147,965.12 | $58,138.96 | $60,173.84 |
| 40 | $147,965.12 | $1,479.65 | $63.27 | $147,901.85 | $59,618.61 | $61,716.76 |
| 41 | $147,901.85 | $1,479.02 | $63.90 | $147,837.95 | $61,097.63 | $63,259.67 |
| 42 | $147,837.95 | $1,478.38 | $64.54 | $147,773.41 | $62,576.00 | $64,802.59 |
| 43 | $147,773.41 | $1,477.73 | $65.18 | $147,708.23 | $64,053.74 | $66,345.51 |
| 44 | $147,708.23 | $1,477.08 | $65.84 | $147,642.39 | $65,530.82 | $67,888.43 |
| 45 | $147,642.39 | $1,476.42 | $66.49 | $147,575.89 | $67,007.24 | $69,431.35 |
| 46 | $147,575.89 | $1,475.76 | $67.16 | $147,508.73 | $68,483.00 | $70,974.27 |
| 47 | $147,508.73 | $1,475.09 | $67.83 | $147,440.90 | $69,958.09 | $72,517.19 |
| 48 | $147,440.90 | $1,474.41 | $68.51 | $147,372.39 | $71,432.50 | $74,060.11 |
| 49 | $147,372.39 | $1,473.72 | $69.19 | $147,303.20 | $72,906.22 | $75,603.03 |
| 50 | $147,303.20 | $1,473.03 | $69.89 | $147,233.31 | $74,379.26 | $77,145.94 |
| 51 | $147,233.31 | $1,472.33 | $70.59 | $147,162.73 | $75,851.59 | $78,688.86 |
| 52 | $147,162.73 | $1,471.63 | $71.29 | $147,091.43 | $77,323.22 | $80,231.78 |
| 53 | $147,091.43 | $1,470.91 | $72.00 | $147,019.43 | $78,794.13 | $81,774.70 |
| 54 | $147,019.43 | $1,470.19 | $72.72 | $146,946.70 | $80,264.33 | $83,317.62 |
| 55 | $146,946.70 | $1,469.47 | $73.45 | $146,873.25 | $81,733.79 | $84,860.54 |
| 56 | $146,873.25 | $1,468.73 | $74.19 | $146,799.07 | $83,202.52 | $86,403.46 |
| 57 | $146,799.07 | $1,467.99 | $74.93 | $146,724.14 | $84,670.52 | $87,946.38 |
| 58 | $146,724.14 | $1,467.24 | $75.68 | $146,648.46 | $86,137.76 | $89,489.30 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 59 | $146,648.46 | $1,466.48 | $76.43 | $146,572.03 | $87,604.24 | $91,032.21 |
| 60 | $146,572.03 | $1,465.72 | $77.20 | $146,494.83 | $89,069.96 | $92,575.13 |
| 61 | $146,494.83 | $1,464.95 | $77.97 | $146,416.86 | $90,534.91 | $94,118.05 |
| 62 | $146,416.86 | $1,464.17 | $78.75 | $146,338.11 | $91,999.08 | $95,660.97 |
| 63 | $146,338.11 | $1,463.38 | $79.54 | $146,258.57 | $93,462.46 | $97,203.89 |
| 64 | $146,258.57 | $1,462.59 | $80.33 | $146,178.24 | $94,925.05 | $98,746.81 |
| 65 | $146,178.24 | $1,461.78 | $81.14 | $146,097.10 | $96,386.83 | $100,289.73 |
| 66 | $146,097.10 | $1,460.97 | $81.95 | $146,015.15 | $97,847.80 | $101,832.65 |
| 67 | $146,015.15 | $1,460.15 | $82.77 | $145,932.38 | $99,307.95 | $103,375.57 |
| 68 | $145,932.38 | $1,459.32 | $83.60 | $145,848.79 | $100,767.27 | $104,918.48 |
| 69 | $145,848.79 | $1,458.49 | $84.43 | $145,764.36 | $102,225.76 | $106,461.40 |
| 70 | $145,764.36 | $1,457.64 | $85.28 | $145,679.08 | $103,683.41 | $108,004.32 |
| 71 | $145,679.08 | $1,456.79 | $86.13 | $145,592.95 | $105,140.20 | $109,547.24 |
| 72 | $145,592.95 | $1,455.93 | $86.99 | $145,505.97 | $106,596.13 | $111,090.16 |
| 73 | $145,505.97 | $1,455.06 | $87.86 | $145,418.11 | $108,051.19 | $112,633.08 |
| 74 | $145,418.11 | $1,454.18 | $88.74 | $145,329.37 | $109,505.37 | $114,176.00 |
| 75 | $145,329.37 | $1,453.29 | $89.63 | $145,239.74 | $110,958.66 | $115,718.92 |
| 76 | $145,239.74 | $1,452.40 | $90.52 | $145,149.22 | $112,411.06 | $117,261.84 |
| 77 | $145,149.22 | $1,451.49 | $91.43 | $145,057.79 | $113,862.55 | $118,804.75 |
| 78 | $145,057.79 | $1,450.58 | $92.34 | $144,965.45 | $115,313.13 | $120,347.67 |
| 79 | $144,965.45 | $1,449.65 | $93.26 | $144,872.19 | $116,762.78 | $121,890.59 |
| 80 | $144,872.19 | $1,448.72 | $94.20 | $144,777.99 | $118,211.50 | $123,433.51 |
| 81 | $144,777.99 | $1,447.78 | $95.14 | $144,682.85 | $119,659.28 | $124,976.43 |
| 82 | $144,682.85 | $1,446.83 | $96.09 | $144,586.76 | $121,106.11 | $126,519.35 |
| 83 | $144,586.76 | $1,445.87 | $97.05 | $144,489.71 | $122,551.98 | $128,062.27 |
| 84 | $144,489.71 | $1,444.90 | $98.02 | $144,391.69 | $123,996.88 | $129,605.19 |
| 85 | $144,391.69 | $1,443.92 | $99.00 | $144,292.69 | $125,440.79 | $131,148.11 |
| 86 | $144,292.69 | $1,442.93 | $99.99 | $144,192.70 | $126,883.72 | $132,691.03 |
| 87 | $144,192.70 | $1,441.93 | $100.99 | $144,091.70 | $128,325.65 | $134,233.94 |
| 88 | $144,091.70 | $1,440.92 | $102.00 | $143,989.70 | $129,766.57 | $135,776.86 |
| 89 | $143,989.70 | $1,439.90 | $103.02 | $143,886.68 | $131,206.46 | $137,319.78 |
| 90 | $143,886.68 | $1,438.87 | $104.05 | $143,782.63 | $132,645.33 | $138,862.70 |
| 91 | $143,782.63 | $1,437.83 | $105.09 | $143,677.54 | $134,083.16 | $140,405.62 |
| 92 | $143,677.54 | $1,436.78 | $106.14 | $143,571.39 | $135,519.93 | $141,948.54 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 93 | $143,571.39 | $1,435.71 | $107.20 | $143,464.19 | $136,955.64 | $143,491.46 |
| 94 | $143,464.19 | $1,434.64 | $108.28 | $143,355.91 | $138,390.29 | $145,034.38 |
| 95 | $143,355.91 | $1,433.56 | $109.36 | $143,246.55 | $139,823.85 | $146,577.30 |
| 96 | $143,246.55 | $1,432.47 | $110.45 | $143,136.10 | $141,256.31 | $148,120.21 |
| 97 | $143,136.10 | $1,431.36 | $111.56 | $143,024.54 | $142,687.67 | $149,663.13 |
| 98 | $143,024.54 | $1,430.25 | $112.67 | $142,911.87 | $144,117.92 | $151,206.05 |
| 99 | $142,911.87 | $1,429.12 | $113.80 | $142,798.07 | $145,547.04 | $152,748.97 |
| 100 | $142,798.07 | $1,427.98 | $114.94 | $142,683.13 | $146,975.02 | $154,291.89 |
| 101 | $142,683.13 | $1,426.83 | $116.09 | $142,567.04 | $148,401.85 | $155,834.81 |
| 102 | $142,567.04 | $1,425.67 | $117.25 | $142,449.79 | $149,827.52 | $157,377.73 |
| 103 | $142,449.79 | $1,424.50 | $118.42 | $142,331.37 | $151,252.02 | $158,920.65 |
| 104 | $142,331.37 | $1,423.31 | $119.61 | $142,211.77 | $152,675.33 | $160,463.57 |
| 105 | $142,211.77 | $1,422.12 | $120.80 | $142,090.96 | $154,097.45 | $162,006.48 |
| 106 | $142,090.96 | $1,420.91 | $122.01 | $141,968.95 | $155,518.36 | $163,549.40 |
| 107 | $141,968.95 | $1,419.69 | $123.23 | $141,845.73 | $156,938.05 | $165,092.32 |
| 108 | $141,845.73 | $1,418.46 | $124.46 | $141,721.26 | $158,356.50 | $166,635.24 |
| 109 | $141,721.26 | $1,417.21 | $125.71 | $141,595.56 | $159,773.72 | $168,178.16 |
| 110 | $141,595.56 | $1,415.96 | $126.96 | $141,468.59 | $161,189.67 | $169,721.08 |
| 111 | $141,468.59 | $1,414.69 | $128.23 | $141,340.36 | $162,604.36 | $171,264.00 |
| 112 | $141,340.36 | $1,413.40 | $129.52 | $141,210.85 | $164,017.76 | $172,806.92 |
| 113 | $141,210.85 | $1,412.11 | $130.81 | $141,080.04 | $165,429.87 | $174,349.84 |
| 114 | $141,080.04 | $1,410.80 | $132.12 | $140,947.92 | $166,840.67 | $175,892.75 |
| 115 | $140,947.92 | $1,409.48 | $133.44 | $140,814.48 | $168,250.15 | $177,435.67 |
| 116 | $140,814.48 | $1,408.14 | $134.77 | $140,679.70 | $169,658.29 | $178,978.59 |
| 117 | $140,679.70 | $1,406.80 | $136.12 | $140,543.58 | $171,065.09 | $180,521.51 |
| 118 | $140,543.58 | $1,405.44 | $137.48 | $140,406.10 | $172,470.53 | $182,064.43 |
| 119 | $140,406.10 | $1,404.06 | $138.86 | $140,267.24 | $173,874.59 | $183,607.35 |
| 120 | $140,267.24 | $1,402.67 | $140.25 | $140,126.99 | $175,277.26 | $185,150.27 |
| 121 | $140,126.99 | $1,401.27 | $141.65 | $139,985.34 | $176,678.53 | $186,693.19 |
| 122 | $139,985.34 | $1,399.85 | $143.07 | $139,842.28 | $178,078.38 | $188,236.11 |
| 123 | $139,842.28 | $1,398.42 | $144.50 | $139,697.78 | $179,476.81 | $189,779.02 |
| 124 | $139,697.78 | $1,396.98 | $145.94 | $139,551.84 | $180,873.79 | $191,321.94 |
| 125 | $139,551.84 | $1,395.52 | $147.40 | $139,404.44 | $182,269.30 | $192,864.86 |
| 126 | $139,404.44 | $1,394.04 | $148.87 | $139,255.57 | $183,663.35 | $194,407.78 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 127 | $139,255.57 | $1,392.56 | $150.36 | $139,105.20 | $185,055.90 | $195,950.70 |
| 128 | $139,105.20 | $1,391.05 | $151.87 | $138,953.34 | $186,446.96 | $197,493.62 |
| 129 | $138,953.34 | $1,389.53 | $153.39 | $138,799.95 | $187,836.49 | $199,036.54 |
| 130 | $138,799.95 | $1,388.00 | $154.92 | $138,645.03 | $189,224.49 | $200,579.46 |
| 131 | $138,645.03 | $1,386.45 | $156.47 | $138,488.56 | $190,610.94 | $202,122.38 |
| 132 | $138,488.56 | $1,384.89 | $158.03 | $138,330.53 | $191,995.82 | $203,665.29 |
| 133 | $138,330.53 | $1,383.31 | $159.61 | $138,170.92 | $193,379.13 | $205,208.21 |
| 134 | $138,170.92 | $1,381.71 | $161.21 | $138,009.71 | $194,760.84 | $206,751.13 |
| 135 | $138,009.71 | $1,380.10 | $162.82 | $137,846.89 | $196,140.94 | $208,294.05 |
| 136 | $137,846.89 | $1,378.47 | $164.45 | $137,682.43 | $197,519.40 | $209,836.97 |
| 137 | $137,682.43 | $1,376.82 | $166.09 | $137,516.34 | $198,896.23 | $211,379.89 |
| 138 | $137,516.34 | $1,375.16 | $167.76 | $137,348.58 | $200,271.39 | $212,922.81 |
| 139 | $137,348.58 | $1,373.49 | $169.43 | $137,179.15 | $201,644.88 | $214,465.73 |
| 140 | $137,179.15 | $1,371.79 | $171.13 | $137,008.02 | $203,016.67 | $216,008.65 |
| 141 | $137,008.02 | $1,370.08 | $172.84 | $136,835.19 | $204,386.75 | $217,551.56 |
| 142 | $136,835.19 | $1,368.35 | $174.57 | $136,660.62 | $205,755.10 | $219,094.48 |
| 143 | $136,660.62 | $1,366.61 | $176.31 | $136,484.31 | $207,121.71 | $220,637.40 |
| 144 | $136,484.31 | $1,364.84 | $178.08 | $136,306.23 | $208,486.55 | $222,180.32 |
| 145 | $136,306.23 | $1,363.06 | $179.86 | $136,126.37 | $209,849.61 | $223,723.24 |
| 146 | $136,126.37 | $1,361.26 | $181.66 | $135,944.72 | $211,210.88 | $225,266.16 |
| 147 | $135,944.72 | $1,359.45 | $183.47 | $135,761.25 | $212,570.32 | $226,809.08 |
| 148 | $135,761.25 | $1,357.61 | $185.31 | $135,575.94 | $213,927.94 | $228,352.00 |
| 149 | $135,575.94 | $1,355.76 | $187.16 | $135,388.78 | $215,283.70 | $229,894.92 |
| 150 | $135,388.78 | $1,353.89 | $189.03 | $135,199.75 | $216,637.58 | $231,437.83 |
| 151 | $135,199.75 | $1,352.00 | $190.92 | $135,008.83 | $217,989.58 | $232,980.75 |
| 152 | $135,008.83 | $1,350.09 | $192.83 | $134,816.00 | $219,339.67 | $234,523.67 |
| 153 | $134,816.00 | $1,348.16 | $194.76 | $134,621.24 | $220,687.83 | $236,066.59 |
| 154 | $134,621.24 | $1,346.21 | $196.71 | $134,424.53 | $222,034.04 | $237,609.51 |
| 155 | $134,424.53 | $1,344.25 | $198.67 | $134,225.86 | $223,378.29 | $239,152.43 |
| 156 | $134,225.86 | $1,342.26 | $200.66 | $134,025.20 | $224,720.55 | $240,695.35 |
| 157 | $134,025.20 | $1,340.25 | $202.67 | $133,822.53 | $226,060.80 | $242,238.27 |
| 158 | $133,822.53 | $1,338.23 | $204.69 | $133,617.84 | $227,399.02 | $243,781.19 |
| 159 | $133,617.84 | $1,336.18 | $206.74 | $133,411.10 | $228,735.20 | $245,324.10 |
| 160 | $133,411.10 | $1,334.11 | $208.81 | $133,202.29 | $230,069.31 | $246,867.02 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 161 | $133,202.29 | $1,332.02 | $210.90 | $132,991.39 | $231,401.34 | $248,409.94 |
| 162 | $132,991.39 | $1,329.91 | $213.00 | $132,778.39 | $232,731.25 | $249,952.86 |
| 163 | $132,778.39 | $1,327.78 | $215.14 | $132,563.25 | $234,059.03 | $251,495.78 |
| 164 | $132,563.25 | $1,325.63 | $217.29 | $132,345.97 | $235,384.67 | $253,038.70 |
| 165 | $132,345.97 | $1,323.46 | $219.46 | $132,126.51 | $236,708.13 | $254,581.62 |
| 166 | $132,126.51 | $1,321.27 | $221.65 | $131,904.85 | $238,029.39 | $256,124.54 |
| 167 | $131,904.85 | $1,319.05 | $223.87 | $131,680.98 | $239,348.44 | $257,667.46 |
| 168 | $131,680.98 | $1,316.81 | $226.11 | $131,454.87 | $240,665.25 | $259,210.37 |
| 169 | $131,454.87 | $1,314.55 | $228.37 | $131,226.50 | $241,979.80 | $260,753.29 |
| 170 | $131,226.50 | $1,312.27 | $230.65 | $130,995.85 | $243,292.06 | $262,296.21 |
| 171 | $130,995.85 | $1,309.96 | $232.96 | $130,762.89 | $244,602.02 | $263,839.13 |
| 172 | $130,762.89 | $1,307.63 | $235.29 | $130,527.60 | $245,909.65 | $265,382.05 |
| 173 | $130,527.60 | $1,305.28 | $237.64 | $130,289.96 | $247,214.93 | $266,924.97 |
| 174 | $130,289.96 | $1,302.90 | $240.02 | $130,049.94 | $248,517.83 | $268,467.89 |
| 175 | $130,049.94 | $1,300.50 | $242.42 | $129,807.52 | $249,818.33 | $270,010.81 |
| 176 | $129,807.52 | $1,298.08 | $244.84 | $129,562.68 | $251,116.40 | $271,553.73 |
| 177 | $129,562.68 | $1,295.63 | $247.29 | $129,315.38 | $252,412.03 | $273,096.64 |
| 178 | $129,315.38 | $1,293.15 | $249.77 | $129,065.62 | $253,705.18 | $274,639.56 |
| 179 | $129,065.62 | $1,290.66 | $252.26 | $128,813.36 | $254,995.84 | $276,182.48 |
| 180 | $128,813.36 | $1,288.13 | $254.79 | $128,558.57 | $256,283.97 | $277,725.40 |
| 181 | $128,558.57 | $1,285.59 | $257.33 | $128,301.24 | $257,569.56 | $279,268.32 |
| 182 | $128,301.24 | $1,283.01 | $259.91 | $128,041.33 | $258,852.57 | $280,811.24 |
| 183 | $128,041.33 | $1,280.41 | $262.51 | $127,778.82 | $260,132.98 | $282,354.16 |
| 184 | $127,778.82 | $1,277.79 | $265.13 | $127,513.69 | $261,410.77 | $283,897.08 |
| 185 | $127,513.69 | $1,275.14 | $267.78 | $127,245.91 | $262,685.91 | $285,440.00 |
| 186 | $127,245.91 | $1,272.46 | $270.46 | $126,975.45 | $263,958.37 | $286,982.91 |
| 187 | $126,975.45 | $1,269.75 | $273.16 | $126,702.29 | $265,228.12 | $288,525.83 |
| 188 | $126,702.29 | $1,267.02 | $275.90 | $126,426.39 | $266,495.14 | $290,068.75 |
| 189 | $126,426.39 | $1,264.26 | $278.65 | $126,147.74 | $267,759.41 | $291,611.67 |
| 190 | $126,147.74 | $1,261.48 | $281.44 | $125,866.30 | $269,020.89 | $293,154.59 |
| 191 | $125,866.30 | $1,258.66 | $284.26 | $125,582.04 | $270,279.55 | $294,697.51 |
| 192 | $125,582.04 | $1,255.82 | $287.10 | $125,294.94 | $271,535.37 | $296,240.43 |
| 193 | $125,294.94 | $1,252.95 | $289.97 | $125,004.97 | $272,788.32 | $297,783.35 |
| 194 | $125,004.97 | $1,250.05 | $292.87 | $124,712.10 | $274,038.37 | $299,326.27 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 195 | $124,712.10 | $1,247.12 | $295.80 | $124,416.30 | $275,285.49 | $300,869.18 |
| 196 | $124,416.30 | $1,244.16 | $298.76 | $124,117.55 | $276,529.65 | $302,412.10 |
| 197 | $124,117.55 | $1,241.18 | $301.74 | $123,815.80 | $277,770.83 | $303,955.02 |
| 198 | $123,815.80 | $1,238.16 | $304.76 | $123,511.04 | $279,008.99 | $305,497.94 |
| 199 | $123,511.04 | $1,235.11 | $307.81 | $123,203.24 | $280,244.10 | $307,040.86 |
| 200 | $123,203.24 | $1,232.03 | $310.89 | $122,892.35 | $281,476.13 | $308,583.78 |
| 201 | $122,892.35 | $1,228.92 | $314.00 | $122,578.35 | $282,705.05 | $310,126.70 |
| 202 | $122,578.35 | $1,225.78 | $317.14 | $122,261.22 | $283,930.84 | $311,669.62 |
| 203 | $122,261.22 | $1,222.61 | $320.31 | $121,940.91 | $285,153.45 | $313,212.54 |
| 204 | $121,940.91 | $1,219.41 | $323.51 | $121,617.40 | $286,372.86 | $314,755.45 |
| 205 | $121,617.40 | $1,216.17 | $326.74 | $121,290.66 | $287,589.03 | $316,298.37 |
| 206 | $121,290.66 | $1,212.91 | $330.01 | $120,960.64 | $288,801.94 | $317,841.29 |
| 207 | $120,960.64 | $1,209.61 | $333.31 | $120,627.33 | $290,011.54 | $319,384.21 |
| 208 | $120,627.33 | $1,206.27 | $336.65 | $120,290.69 | $291,217.82 | $320,927.13 |
| 209 | $120,290.69 | $1,202.91 | $340.01 | $119,950.67 | $292,420.72 | $322,470.05 |
| 210 | $119,950.67 | $1,199.51 | $343.41 | $119,607.26 | $293,620.23 | $324,012.97 |
| 211 | $119,607.26 | $1,196.07 | $346.85 | $119,260.42 | $294,816.30 | $325,555.89 |
| 212 | $119,260.42 | $1,192.60 | $350.31 | $118,910.10 | $296,008.91 | $327,098.81 |
| 213 | $118,910.10 | $1,189.10 | $353.82 | $118,556.28 | $297,198.01 | $328,641.72 |
| 214 | $118,556.28 | $1,185.56 | $357.36 | $118,198.93 | $298,383.57 | $330,184.64 |
| 215 | $118,198.93 | $1,181.99 | $360.93 | $117,838.00 | $299,565.56 | $331,727.56 |
| 216 | $117,838.00 | $1,178.38 | $364.54 | $117,473.46 | $300,743.94 | $333,270.48 |
| 217 | $117,473.46 | $1,174.73 | $368.18 | $117,105.27 | $301,918.67 | $334,813.40 |
| 218 | $117,105.27 | $1,171.05 | $371.87 | $116,733.41 | $303,089.73 | $336,356.32 |
| 219 | $116,733.41 | $1,167.33 | $375.58 | $116,357.82 | $304,257.06 | $337,899.24 |
| 220 | $116,357.82 | $1,163.58 | $379.34 | $115,978.48 | $305,420.64 | $339,442.16 |
| 221 | $115,978.48 | $1,159.78 | $383.13 | $115,595.35 | $306,580.42 | $340,985.08 |
| 222 | $115,595.35 | $1,155.95 | $386.97 | $115,208.38 | $307,736.38 | $342,527.99 |
| 223 | $115,208.38 | $1,152.08 | $390.84 | $114,817.55 | $308,888.46 | $344,070.91 |
| 224 | $114,817.55 | $1,148.18 | $394.74 | $114,422.81 | $310,036.64 | $345,613.83 |
| 225 | $114,422.81 | $1,144.23 | $398.69 | $114,024.11 | $311,180.87 | $347,156.75 |
| 226 | $114,024.11 | $1,140.24 | $402.68 | $113,621.44 | $312,321.11 | $348,699.67 |
| 227 | $113,621.44 | $1,136.21 | $406.70 | $113,214.73 | $313,457.32 | $350,242.59 |
| 228 | $113,214.73 | $1,132.15 | $410.77 | $112,803.96 | $314,589.47 | $351,785.51 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 229 | $112,803.96 | $1,128.04 | $414.88 | $112,389.08 | $315,717.51 | $353,328.43 |
| 230 | $112,389.08 | $1,123.89 | $419.03 | $111,970.05 | $316,841.40 | $354,871.35 |
| 231 | $111,970.05 | $1,119.70 | $423.22 | $111,546.83 | $317,961.10 | $356,414.26 |
| 232 | $111,546.83 | $1,115.47 | $427.45 | $111,119.38 | $319,076.57 | $357,957.18 |
| 233 | $111,119.38 | $1,111.19 | $431.73 | $110,687.66 | $320,187.76 | $359,500.10 |
| 234 | $110,687.66 | $1,106.88 | $436.04 | $110,251.62 | $321,294.64 | $361,043.02 |
| 235 | $110,251.62 | $1,102.52 | $440.40 | $109,811.21 | $322,397.15 | $362,585.94 |
| 236 | $109,811.21 | $1,098.11 | $444.81 | $109,366.41 | $323,495.27 | $364,128.86 |
| 237 | $109,366.41 | $1,093.66 | $449.25 | $108,917.15 | $324,588.93 | $365,671.78 |
| 238 | $108,917.15 | $1,089.17 | $453.75 | $108,463.40 | $325,678.10 | $367,214.70 |
| 239 | $108,463.40 | $1,084.63 | $458.28 | $108,005.12 | $326,762.74 | $368,757.62 |
| 240 | $108,005.12 | $1,080.05 | $462.87 | $107,542.25 | $327,842.79 | $370,300.53 |
| 241 | $107,542.25 | $1,075.42 | $467.50 | $107,074.76 | $328,918.21 | $371,843.45 |
| 242 | $107,074.76 | $1,070.75 | $472.17 | $106,602.58 | $329,988.96 | $373,386.37 |
| 243 | $106,602.58 | $1,066.03 | $476.89 | $106,125.69 | $331,054.98 | $374,929.29 |
| 244 | $106,125.69 | $1,061.26 | $481.66 | $105,644.03 | $332,116.24 | $376,472.21 |
| 245 | $105,644.03 | $1,056.44 | $486.48 | $105,157.55 | $333,172.68 | $378,015.13 |
| 246 | $105,157.55 | $1,051.58 | $491.34 | $104,666.21 | $334,224.26 | $379,558.05 |
| 247 | $104,666.21 | $1,046.66 | $496.26 | $104,169.95 | $335,270.92 | $381,100.97 |
| 248 | $104,169.95 | $1,041.70 | $501.22 | $103,668.73 | $336,312.62 | $382,643.89 |
| 249 | $103,668.73 | $1,036.69 | $506.23 | $103,162.50 | $337,349.30 | $384,186.80 |
| 250 | $103,162.50 | $1,031.62 | $511.29 | $102,651.21 | $338,380.93 | $385,729.72 |
| 251 | $102,651.21 | $1,026.51 | $516.41 | $102,134.80 | $339,407.44 | $387,272.64 |
| 252 | $102,134.80 | $1,021.35 | $521.57 | $101,613.23 | $340,428.79 | $388,815.56 |
| 253 | $101,613.23 | $1,016.13 | $526.79 | $101,086.44 | $341,444.92 | $390,358.48 |
| 254 | $101,086.44 | $1,010.86 | $532.05 | $100,554.39 | $342,455.79 | $391,901.40 |
| 255 | $100,554.39 | $1,005.54 | $537.38 | $100,017.01 | $343,461.33 | $393,444.32 |
| 256 | $100,017.01 | $1,000.17 | $542.75 | $99,474.26 | $344,461.50 | $394,987.24 |
| 257 | $99,474.26 | $994.74 | $548.18 | $98,926.09 | $345,456.24 | $396,530.16 |
| 258 | $98,926.09 | $989.26 | $553.66 | $98,372.43 | $346,445.50 | $398,073.08 |
| 259 | $98,372.43 | $983.72 | $559.19 | $97,813.23 | $347,429.23 | $399,615.99 |
| 260 | $97,813.23 | $978.13 | $564.79 | $97,248.45 | $348,407.36 | $401,158.91 |
| 261 | $97,248.45 | $972.48 | $570.43 | $96,678.01 | $349,379.85 | $402,701.83 |
| 262 | $96,678.01 | $966.78 | $576.14 | $96,101.87 | $350,346.63 | $404,244.75 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 263 | $96,101.87 | $961.02 | $581.90 | $95,519.97 | $351,307.64 | $405,787.67 |
| 264 | $95,519.97 | $955.20 | $587.72 | $94,932.26 | $352,262.84 | $407,330.59 |
| 265 | $94,932.26 | $949.32 | $593.60 | $94,338.66 | $353,212.17 | $408,873.51 |
| 266 | $94,338.66 | $943.39 | $599.53 | $93,739.13 | $354,155.55 | $410,416.43 |
| 267 | $93,739.13 | $937.39 | $605.53 | $93,133.60 | $355,092.94 | $411,959.35 |
| 268 | $93,133.60 | $931.34 | $611.58 | $92,522.02 | $356,024.28 | $413,502.26 |
| 269 | $92,522.02 | $925.22 | $617.70 | $91,904.32 | $356,949.50 | $415,045.18 |
| 270 | $91,904.32 | $919.04 | $623.88 | $91,280.44 | $357,868.54 | $416,588.10 |
| 271 | $91,280.44 | $912.80 | $630.11 | $90,650.33 | $358,781.35 | $418,131.02 |
| 272 | $90,650.33 | $906.50 | $636.42 | $90,013.91 | $359,687.85 | $419,673.94 |
| 273 | $90,013.91 | $900.14 | $642.78 | $89,371.13 | $360,587.99 | $421,216.86 |
| 274 | $89,371.13 | $893.71 | $649.21 | $88,721.92 | $361,481.70 | $422,759.78 |
| 275 | $88,721.92 | $887.22 | $655.70 | $88,066.22 | $362,368.92 | $424,302.70 |
| 276 | $88,066.22 | $880.66 | $662.26 | $87,403.97 | $363,249.58 | $425,845.62 |
| 277 | $87,403.97 | $874.04 | $668.88 | $86,735.09 | $364,123.62 | $427,388.53 |
| 278 | $86,735.09 | $867.35 | $675.57 | $86,059.52 | $364,990.97 | $428,931.45 |
| 279 | $86,059.52 | $860.60 | $682.32 | $85,377.20 | $365,851.57 | $430,474.37 |
| 280 | $85,377.20 | $853.77 | $689.15 | $84,688.05 | $366,705.34 | $432,017.29 |
| 281 | $84,688.05 | $846.88 | $696.04 | $83,992.01 | $367,552.22 | $433,560.21 |
| 282 | $83,992.01 | $839.92 | $703.00 | $83,289.01 | $368,392.14 | $435,103.13 |
| 283 | $83,289.01 | $832.89 | $710.03 | $82,578.98 | $369,225.03 | $436,646.05 |
| 284 | $82,578.98 | $825.79 | $717.13 | $81,861.86 | $370,050.82 | $438,188.97 |
| 285 | $81,861.86 | $818.62 | $724.30 | $81,137.56 | $370,869.44 | $439,731.89 |
| 286 | $81,137.56 | $811.38 | $731.54 | $80,406.01 | $371,680.82 | $441,274.80 |
| 287 | $80,406.01 | $804.06 | $738.86 | $79,667.15 | $372,484.88 | $442,817.72 |
| 288 | $79,667.15 | $796.67 | $746.25 | $78,920.91 | $373,281.55 | $444,360.64 |
| 289 | $78,920.91 | $789.21 | $753.71 | $78,167.20 | $374,070.76 | $445,903.56 |
| 290 | $78,167.20 | $781.67 | $761.25 | $77,405.95 | $374,852.43 | $447,446.48 |
| 291 | $77,405.95 | $774.06 | $768.86 | $76,637.09 | $375,626.49 | $448,989.40 |
| 292 | $76,637.09 | $766.37 | $776.55 | $75,860.54 | $376,392.86 | $450,532.32 |
| 293 | $75,860.54 | $758.61 | $784.31 | $75,076.23 | $377,151.46 | $452,075.24 |
| 294 | $75,076.23 | $750.76 | $792.16 | $74,284.07 | $377,902.23 | $453,618.16 |
| 295 | $74,284.07 | $742.84 | $800.08 | $73,483.99 | $378,645.07 | $455,161.07 |
| 296 | $73,483.99 | $734.84 | $808.08 | $72,675.91 | $379,379.91 | $456,703.99 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 297 | $72,675.91 | $726.76 | $816.16 | $71,859.75 | $380,106.67 | $458,246.91 |
| 298 | $71,859.75 | $718.60 | $824.32 | $71,035.43 | $380,825.26 | $459,789.83 |
| 299 | $71,035.43 | $710.35 | $832.56 | $70,202.87 | $381,535.62 | $461,332.75 |
| 300 | $70,202.87 | $702.03 | $840.89 | $69,361.98 | $382,237.65 | $462,875.67 |
| 301 | $69,361.98 | $693.62 | $849.30 | $68,512.68 | $382,931.27 | $464,418.59 |
| 302 | $68,512.68 | $685.13 | $857.79 | $67,654.89 | $383,616.39 | $465,961.51 |
| 303 | $67,654.89 | $676.55 | $866.37 | $66,788.52 | $384,292.94 | $467,504.43 |
| 304 | $66,788.52 | $667.89 | $875.03 | $65,913.48 | $384,960.83 | $469,047.34 |
| 305 | $65,913.48 | $659.13 | $883.78 | $65,029.70 | $385,619.96 | $470,590.26 |
| 306 | $65,029.70 | $650.30 | $892.62 | $64,137.08 | $386,270.26 | $472,133.18 |
| 307 | $64,137.08 | $641.37 | $901.55 | $63,235.53 | $386,911.63 | $473,676.10 |
| 308 | $63,235.53 | $632.36 | $910.56 | $62,324.97 | $387,543.99 | $475,219.02 |
| 309 | $62,324.97 | $623.25 | $919.67 | $61,405.30 | $388,167.23 | $476,761.94 |
| 310 | $61,405.30 | $614.05 | $928.87 | $60,476.43 | $388,781.29 | $478,304.86 |
| 311 | $60,476.43 | $604.76 | $938.15 | $59,538.28 | $389,386.05 | $479,847.78 |
| 312 | $59,538.28 | $595.38 | $947.54 | $58,590.74 | $389,981.43 | $481,390.70 |
| 313 | $58,590.74 | $585.91 | $957.01 | $57,633.73 | $390,567.34 | $482,933.61 |
| 314 | $57,633.73 | $576.34 | $966.58 | $56,667.15 | $391,143.68 | $484,476.53 |
| 315 | $56,667.15 | $566.67 | $976.25 | $55,690.90 | $391,710.35 | $486,019.45 |
| 316 | $55,690.90 | $556.91 | $986.01 | $54,704.89 | $392,267.26 | $487,562.37 |
| 317 | $54,704.89 | $547.05 | $995.87 | $53,709.02 | $392,814.31 | $489,105.29 |
| 318 | $53,709.02 | $537.09 | $1,005.83 | $52,703.19 | $393,351.40 | $490,648.21 |
| 319 | $52,703.19 | $527.03 | $1,015.89 | $51,687.30 | $393,878.43 | $492,191.13 |
| 320 | $51,687.30 | $516.87 | $1,026.05 | $50,661.26 | $394,395.30 | $493,734.05 |
| 321 | $50,661.26 | $506.61 | $1,036.31 | $49,624.95 | $394,901.92 | $495,276.97 |
| 322 | $49,624.95 | $496.25 | $1,046.67 | $48,578.28 | $395,398.17 | $496,819.88 |
| 323 | $48,578.28 | $485.78 | $1,057.14 | $47,521.15 | $395,883.95 | $498,362.80 |
| 324 | $47,521.15 | $475.21 | $1,067.71 | $46,453.44 | $396,359.16 | $499,905.72 |
| 325 | $46,453.44 | $464.53 | $1,078.38 | $45,375.05 | $396,823.69 | $501,448.64 |
| 326 | $45,375.05 | $453.75 | $1,089.17 | $44,285.89 | $397,277.45 | $502,991.56 |
| 327 | $44,285.89 | $442.86 | $1,100.06 | $43,185.83 | $397,720.30 | $504,534.48 |
| 328 | $43,185.83 | $431.86 | $1,111.06 | $42,074.76 | $398,152.16 | $506,077.40 |
| 329 | $42,074.76 | $420.75 | $1,122.17 | $40,952.59 | $398,572.91 | $507,620.32 |
| 330 | $40,952.59 | $409.53 | $1,133.39 | $39,819.20 | $398,982.44 | $509,163.24 |

| Payment Number | Beginning Balance | Interest Payment | Principal Payment | Ending Balance | Cumulative Interest | Cumulative Payments |
|---|---|---|---|---|---|---|
| 331 | $39,819.20 | $398.19 | $1,144.73 | $38,674.47 | $399,380.63 | $510,706.15 |
| 332 | $38,674.47 | $386.74 | $1,156.17 | $37,518.30 | $399,767.37 | $512,249.07 |
| 333 | $37,518.30 | $375.18 | $1,167.74 | $36,350.56 | $400,142.56 | $513,791.99 |
| 334 | $36,350.56 | $363.51 | $1,179.41 | $35,171.15 | $400,506.06 | $515,334.91 |
| 335 | $35,171.15 | $351.71 | $1,191.21 | $33,979.94 | $400,857.77 | $516,877.83 |
| 336 | $33,979.94 | $339.80 | $1,203.12 | $32,776.82 | $401,197.57 | $518,420.75 |
| 337 | $32,776.82 | $327.77 | $1,215.15 | $31,561.67 | $401,525.34 | $519,963.67 |
| 338 | $31,561.67 | $315.62 | $1,227.30 | $30,334.37 | $401,840.96 | $521,506.59 |
| 339 | $30,334.37 | $303.34 | $1,239.58 | $29,094.80 | $402,144.30 | $523,049.51 |
| 340 | $29,094.80 | $290.95 | $1,251.97 | $27,842.82 | $402,435.25 | $524,592.42 |
| 341 | $27,842.82 | $278.43 | $1,264.49 | $26,578.33 | $402,713.68 | $526,135.34 |
| 342 | $26,578.33 | $265.78 | $1,277.14 | $25,301.20 | $402,979.46 | $527,678.26 |
| 343 | $25,301.20 | $253.01 | $1,289.91 | $24,011.29 | $403,232.47 | $529,221.18 |
| 344 | $24,011.29 | $240.11 | $1,302.81 | $22,708.49 | $403,472.59 | $530,764.10 |
| 345 | $22,708.49 | $227.08 | $1,315.83 | $21,392.65 | $403,699.67 | $532,307.02 |
| 346 | $21,392.65 | $213.93 | $1,328.99 | $20,063.66 | $403,913.60 | $533,849.94 |
| 347 | $20,063.66 | $200.64 | $1,342.28 | $18,721.38 | $404,114.23 | $535,392.86 |
| 348 | $18,721.38 | $187.21 | $1,355.71 | $17,365.67 | $404,301.45 | $536,935.78 |
| 349 | $17,365.67 | $173.66 | $1,369.26 | $15,996.41 | $404,475.10 | $538,478.69 |
| 350 | $15,996.41 | $159.96 | $1,382.95 | $14,613.45 | $404,635.07 | $540,021.61 |
| 351 | $14,613.45 | $146.13 | $1,396.78 | $13,216.67 | $404,781.20 | $541,564.53 |
| 352 | $13,216.67 | $132.17 | $1,410.75 | $11,805.92 | $404,913.37 | $543,107.45 |
| 353 | $11,805.92 | $118.06 | $1,424.86 | $10,381.06 | $405,031.43 | $544,650.37 |
| 354 | $10,381.06 | $103.81 | $1,439.11 | $8,941.95 | $405,135.24 | $546,193.29 |
| 355 | $8,941.95 | $89.42 | $1,453.50 | $7,488.45 | $405,224.66 | $547,736.21 |
| 356 | $7,488.45 | $74.88 | $1,468.03 | $6,020.42 | $405,299.54 | $549,279.13 |
| 357 | $6,020.42 | $60.20 | $1,482.71 | $4,537.70 | $405,359.75 | $550,822.05 |
| 358 | $4,537.70 | $45.38 | $1,497.54 | $3,040.16 | $405,405.12 | $552,364.96 |
| 359 | $3,040.16 | $30.40 | $1,512.52 | $1,527.64 | $405,435.53 | $553,907.88 |
| 360 | $1,527.64 | $15.28 | $1,527.64 | $0.00 | $405,450.80 | $555,450.80 |

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of February 23, 2023 ("**Effective Date**") (as amended, supplemented, or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and between Pizzeria Management III LLC, an Ohio limited liability company ("**PM III**") and Jason Dicks, owner of 100% of the membership interest in PM III ("**Jason**," collectively with PM III, the "**Grantor**"), in favor of Joseph T. Ciresi, (the "**Secured Party**").

WHEREAS, as of the Effective Date, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount not exceeding Three Hundred and Twenty-Five Thousand Dollars ($325,000) (the "**Loan**"), evidenced by that certain Promissory Note of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**Loan Agreement**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Lender to make the Loan under the Loan Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions.

    (a)  Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

    (b)  Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

    (c)  For purposes of this Agreement, the following terms shall have the following meanings:

    "**Collateral**" has the meaning set forth in Section 2.

    "**Event of Default**" has the meaning set forth in the Loan Agreement.

    "**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement).

    "**Perfection Certificate**" has the meaning set forth in Section 5.


PLAINTIFF'S EXHIBIT
B

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon, or distributions with respect thereto.

"**Secured Obligations**" has the meaning set forth in Section 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Ohio or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2. <u>Grant of Security Interest</u>. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a) all fixtures and personal property of every kind and nature including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities (including but not limited to all membership interests in PM III) and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and

(b) all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty, or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3. <u>Secured Obligations</u>. The Collateral secures the due and prompt payment and performance of:

(a) the obligations of the Grantor from time to time arising under the Loan Agreement, this Agreement, or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loan (including interest accruing during the pendency of any bankruptcy, insolvency, receivership, or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment, or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses, and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership, or other similar proceeding, regardless of whether allowed or

allowable in such proceeding), of the Grantor under or in respect of the Loan Agreement and this Agreement; and

(b)     all other covenants, duties, debts, obligations, and liabilities of any kind of the Grantor under or in respect of the Loan Agreement, this Agreement, or any other document made, delivered, or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership, or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification, or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums, and expenses set forth in Section 3 being herein collectively called the "**Secured Obligations**").

4.     Perfection of Security Interest and Further Assurances.

(a)     The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the UCC as applicable, the Grantor shall take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b)     The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing, or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)     The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming, continuing, enforcing, or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents, or warehouse receipts relating to the Collateral, the Grantor shall endorse, assign, and deliver the same to the

Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)     If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party.

(f)     If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection, or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.     <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a)     It will, upon request by the Secured Party, deliver to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" ("**Perfection Certificate**"), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(b)     All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(c)     The Collateral consisting of securities have been duly authorized and validly issued, and are fully paid and non-assessable and subject to no options to purchase or similar rights. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships,

or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances.

(d)    At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal, and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option, or right of others except for the security interest created by this Agreement.

(e)    The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(f)    It has full power, authority, and legal right to borrow the Loan and pledge the Collateral pursuant to this Agreement.

(g)    Each of this Agreement and the Loan Agreement has been duly authorized, executed, and delivered by the Grantor and constitutes a legal, valid, and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(h)    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loan and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(i)    The execution and delivery of the Loan Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award, or decree of any court, arbitrator, or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(j)    The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the UCC as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.    Voting, Distributions and Receivables.

(a)     The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor, vote and give consents, ratifications, and waivers with respect thereto, except to the extent that any such vote, consent, ratification, or waiver could detract from the value thereof as Collateral or which could be inconsistent with or result in any violation of any provision of the Loan Agreement or this Agreement, and from time to time, upon request from the Grantor, the Secured Party shall deliver to the Grantor suitable proxies so that the Grantor may cast such votes, consents, ratifications, and waivers.

(b)     If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument, or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.     Covenants. The Grantor covenants as follows:

(a)     The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business, or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)     The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)     The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)     The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit, or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein.

(e)     The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Secured Party's discretion to take any action and to execute any instrument that the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.     Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.     Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.     Remedies Upon Default.

(a)     If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate, or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is

necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee, or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned, or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages, and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)     If any Event of Default shall have occurred and be continuing, all rights of the Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 6(a) shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral.

(c)     If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the

balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(d)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission, or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.     <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered, or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)     any change in the time, place, or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment, or other modification of the Loan Agreement, this Agreement, or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment, or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations;

(d)     any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)     any default, failure, or delay, wilful or otherwise, in the performance of the Secured Obligations;

(f)     any defense, set-off, or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)     any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loan or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor, or surety.

14.     Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated, or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.     Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.     Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors, and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees, and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.     Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer, and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.     GOVERNING LAW. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Ohio.

19.     Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement constitutes the entire contract among the parties with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Pizzeria Management III LLC, as Grantor

By

Name: Jason Dicks

Title: Member

Address for Notices:
    13910 Claridon Troy Road

    Burton, Ohio 44021


Jason Dicks, as Grantor

Address for Notices:
    13910 Claridon Troy Road

    Burton, Ohio 44021


Joseph T. Ciresi, as Secured Party

Address for Notices:
    25780 Miles Road, Suite A

    Bedford Heights, Ohio 44146



# Ohio Secretary of State
# Business Queries

## UCC Search Results by Debtor Name

| Number | Debtor Name | Secure Party Name | Filling Type | File Date | Lapse Date |
|---|---|---|---|---|---|
| OH00288564585 | Pizzeria Management III LLC<br>JD Restaurant Services Inc.<br>JASON DICKS | iPlanGroup Agent for Custodian FBO<br>Christian Carson IRA | Original | 14-Mar-2025 | 14-Mar-2030 |



PLAINTIFF'S EXHIBIT

C